**IN THE COURT OF APPEALS OF IOWA**

No. 16-0048
Filed May 11, 2016

**IN THE INTEREST OF J.A. AND I.A.,**
**Minor children,**

**B.A., Mother,**
Appellant,

**J.P and G.P,**
Intervenors-Appellants.

_____

Appeal from the Iowa District Court for Bremer County, Peter B. Newell, District Associate Judge.

A mother appeals the termination of her parental rights to two children. **AFFIRMED ON BOTH APPEALS.**

Shanna M. Chevalier of Laird & Luhring, Waverly for appellant mother.

Sara A. Kersenbrock of Kersenbrock Law Office, Waterloo, for appellants intervenors.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Linnea N. Nicol of the Waterloo Juvenile Public Defender, Waterloo, for minor children.

Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**VAITHESWARAN, Judge.**

A mother appeals the termination of her parental rights to two children, born in 2012 and 2014.  The maternal great-grandparents, who intervened in the proceedings, appeal the district court's refusal to grant them guardianship and custody of one of the two children.

## I.    Mother

The mother challenges the evidence supporting the grounds for termination cited by the district court and contends termination was not in the children's best interests.  We may affirm if we find clear and convincing evidence to support any of the grounds cited by the district court.  *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999).  On our de novo review, we are persuaded the State proved the children could not be returned to the mother's custody as required by Iowa Code section 232.116(h) (2015).

The twenty-four-year-old mother has a history of substance abuse dating back to the age of twelve.  Her involvement with the department of human services began in 2010.  Her parental rights to three of her five children were terminated in separate proceedings.  The second and third children were adopted by their maternal great-grandparents.  The fourth and fifth children were the subject of this proceeding.

In 2014, one of the mother's older children was discovered alone at a hotel swimming pool.  The mother was found passed out in a hotel room with a hypodermic needle next to her.  The district court ordered the removal of the second, third, and fourth children and ordered temporary custody placed with the department.  The children were subsequently adjudicated in need of assistance

and were placed with their maternal great-grandparents under the protective supervision of the department.

Meanwhile, the fifth child was born. Because the mother was complying with services, the department did not request the child's removal.

In early 2015, the fourth child began a trial home placement with the mother. Soon, the child was returned to her custody. Within a month, the mother was observed slurring her speech and having difficulty keeping her eyes open. According to a department employee, "Concern was that she was using substances." The fourth and fifth children were removed from her custody. The fourth child was placed with the maternal great-grandparents. The youngest child was placed in foster care.

The termination hearing took place on two days over a one month period. On the first day, the mother arrived twenty minutes late. In less than twenty minutes, she left. The mother's attorney stated, "My client indicated to me at the table before she left that she wanted to sign the papers . . . ." The court asked, "Signing the paper, meaning consenting to termination of parental rights?" Counsel answered, "Yes." The mother expressed a similar intent a month before the first day of the termination hearing. Although she appeared on the second day of the termination hearing, she did not retract these assertions.

Instead, the mother presented evidence of her frustration with the department. A visitation supervisor stated the mother discontinued visits because "[s]he did not feel that the case was going anywhere and she did not want to set herself up or her kids up for that . . . event." The mother's mother essentially seconded this opinion, as did one of the mother's psychiatric

providers. The provider reported, "Inability to maintain the[] [department's] demands created a sense of hopelessness, fear, and emotional dysregulation."[1]

We do not minimize this sense of hopelessness. But much of it was of the mother's own making. The department expected her to follow through with a variety of services but also returned the fourth child to her on a trial basis, affording her the opportunity to attempt permanent reunification. The mother squandered the opportunity by returning to substance use. It is true that a substance abuse evaluator who interviewed and screened the mother two months before the termination hearing declined "to recommend . . . substance abuse treatment." However, the evaluator opined that the mother's continued use of alcohol would violate the terms of her probation for a prior crime.

The mother also ended the thrice-weekly visits offered by the department—the single service that allowed her to maintain her relationship with the children. Although she asked to reinitiate contact after the first day of the termination hearing, she had only one visit in the month before the second hearing date.

Finally, the mother retracted releases that would have allowed the department to contact service providers about her progress. At the time of the termination hearing, her own mother did not know where she was living. We agree with the district court that the children could not be returned to her custody.

We also agree termination was in the children's best interests. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). The mother's substance abuse

---

[1] The psychiatric provider opined the mother "has the capability and high potential to provide care to her 2 youngest children." However, the provider's involvement with the mother ended six months before the first day of the termination hearing.

compromised the children's safety, and her refusal to engage in visits weakened the bond she shared with them. For these reasons, we affirm the termination of the mother's parental rights to these children.

## II. Maternal Great-Grandparents

As part of the termination order, the district court ordered guardianship and custody of the mother's fourth child transferred to the department. The court also ordered the child "removed from the home of [the maternal great-grandparents] and placed by the [department] in an appropriate foster home."[2]

The maternal great-grandparents challenge this order. They assert the fourth child "enjoyed that placement [with them] for two years with her next two older siblings." They seek reversal of the order giving the department guardianship and custody of this child and seek guardianship and custody of the child "for purposes of adoption."

After ordering parental rights terminated, a court is statutorily authorized to transfer guardianship and custody of a child to one of several persons or entities, including the department or "other relative." *See* Iowa Code § 232.117(3)(a), (c). The court also has authority to remove a guardian. *See id.* § 232.118(1). However, the statute does not specify criteria for removal. *See In re N.V.*, ___ N.W.2d ___, ___, 2016 WL 757423, at *4 (Iowa Ct. App. 2016). "In the absence of statutory criteria, this court has examined the reasonableness of the current guardian's actions and the best interests of the child." *Id.*

---

[2] Additionally, the court stated the child should be placed in the home of the foster parents caring for the youngest child. We question whether the court had the authority to direct a specific placement. *See In re E.G.*, 738 N.W.2d 653, 657 (Iowa Ct. App. 2007). However, this aspect of the court's ruling is not challenged.

The great-grandparents argue the department acted unreasonably in recommending removal of the fourth child from "[t]he only stable home" she has ever known. They point to witness testimony supporting their assertion that their home was the best placement for the child. The State counters by citing a failed home study and a child abuse report.

The evidence on the adequacy of the great-grandparents' home was conflicting. A child psychologist testified he did not pick up on anything that would place the children in danger in the great-grandparents' care. He stated moving the fourth child out of the home would be detrimental to her well-being because "this is the home . . . that she has known for most of her life. She has siblings and family members in that home. And . . . the family is receptive to working through whatever kinds of issues are presented." He opined the child should "remain in the stable environment; that she remain with her two siblings."

A social worker who worked with the family similarly supported the fourth child's placement in the great-grandparents' home. She cited the bond between the three-year-old and her great-grandmother and the "positive direction" in which the family was heading.

The fourth child's family physician opined he had no concern that the child was exposed to physical abuse by the great-grandparents. And a professional "home visitor" opined the children "were safe" in the great-grandparents' home.

Against this evidence, the State presented a home study report prepared by a service provider. The author expressed "concerns as to the daily routine of this family," stated the great-grandparents did not "co-parent well," and opined

the great-grandparents "are not adequately supervising their grandchildren." She declined to recommend them as adoptive parents of the fourth child.

The State also cited a confirmed child abuse report naming the great-grandfather as perpetrator.[3] According to the department social worker, he was picking up the three children from a visit when the older two started acting up. In attempting to get them into the car, he struck one of them, causing her lip to bleed. The department acknowledged the incident was "considered isolated" and "not likely to reoccur" and would not preclude the court from allowing the great-grandparents from serving as guardians. Nonetheless, the department opined overall concerns about the children's supervision supported the recommendation to remove the fourth child.[4]

The district court found these concerns overrode the "well-respected" opinions of the professionals who testified on behalf of the great-grandparents. We agree. While the professionals provided cogent reasons for keeping the fourth child in the great-grandparents' home, they also noted that the great-grandparents had their hands full with the two older children and their significant behavioral issues. Under these circumstances, we conclude the department did not act unreasonably in recommending removal of the fourth child from their care. Guardianship and custody of the child was appropriately granted to the department.

---

[3] The department social worker also cited another report, which was not confirmed. On our de novo review, we decline to consider that report.

[4] Those concerns included the great-grandfather's failure to use a car seat for the fourth child, "bumps and bruises" on the children, and the number of people in and out of the home.

### *III.    Disposition*

We affirm the termination of the mother's parental rights to her fourth and fifth children.  We also affirm the district court's decision to place guardianship and custody of the children with the department rather than the maternal great-grandparents.

**AFFIRMED ON BOTH APPEALS.**